CARY (SAN FRANCISCO SAVINGS & LOAN SOCIETY v.). See Case No. 12,-317.

CARY (STURGESS v.). See Case No. 13,-572.

CARY (STURGIS v.). See Case No. 13,573.

CASANAVE (WASHINGTON v.). See Case No. 17,225.

## Case No. 2,486.

### The CASCO.

[2 Ware (Dav. 184) 188:[1] 4 Law Rep. 471; 15 Hunt. Mer. Mag. 290.]

District Court, D. Maine. Feb. 10, 1842.

AFFREIGHTMENT—RIGHTS OF SHIPPER—LIABILITIES OF OWNERS.

1. In every contract of affreightment, whether by charter-party or bill of lading. the ship is, by the marine law, hypothecated to the shipper for any damage his goods may sustain from the insufficiency of the vessel, or the fault of the master or crew.

[Cited in The Flash, Case No. 4,857; The Hendrik Hudson. Id. 6,358: The Bird of Paradise, 5 Wall. (72 U. S.) 563.]

2. If a vessel is let on a contract of affreightment, by charter-party, the owners will not be held responsible for a loss occasioned by the violence of the elements. although the dangers of the seas are not expressly excepted by the charter-party

[Cited in The Star of Hope, Case No. 13,312; The J. A. Goddard, 12 Fed. 184; The Giles Loring, 48 Fed. 470.]

3. But if they are chargeable with any neglect or fault without which the loss would not have happened. they will be liable.

[Cited in The Giles Loring, 48 Fed. 470.]

[1] [Reported by Edward H. Daveis, Esq.]

In admiralty. This was a libel on a charter-party. The master of the brig Casco chartered her to the libellant for a voyage to Porto Rico, to carry a cargo of lumber, and from thence to her port of discharge in the United States, touching at Turk's Island for a cargo of salt, if required by the charterer. The voyage was performed to Porto Rico and the cargo delivered. From that place she went to Turk's Island and took a cargo of salt. On her return from Turk's Island she was found to leak so badly that a large part of the salt was lost. Of 5,676 bushels laden, only 3,132 bushels were delivered at Portland, the deficiency amounting to 2,544 bushels. This libel was brought by the charterer against the vessel to recover damages for the loss. The questions of law which arose and were discussed in the case, together with the substance of the testimony, appear in the opinion of the court.

Mr. Rand, for libellant.

T. A. Deblois, for respondents.

WARE, District Judge. The first question, which was raised and discussed at the bar, was whether, under this charter-party, the vessel in specie is liable for any loss, which the charterer may have sustained from damage to the cargo. It is contended on behalf of the respondents, that there was a demise of the vessel herself to the charterer, by which the possession was transferred to him; that he, under the charter-party, became owner for the voyage, and thus his own carrier, and consequently. if any damages have been sustained from the fault of the master or crew, his remedy is solely against the master, and not against the vessel. This is a question which must be determined by the terms of the instrument itself.

The charter-party is in its form somewhat special and peculiar. It sets forth that it is made and concluded between Allen G. York, the master. who is also part-owner, and John B. Brown. the libellant; and the master, in consideration of the covenants and agreements of the libellant, does covenant and agree on the freighting and chartering of said vessel to the said party of the second part (the libellant), for a voyage from the port of Portland, 'to one port in the island of Porto Rico, and from thence to her port of discharge in the United States, touching at Turk's Island for a cargo of salt, if required by the party of the second part.' The charter-party then proceeds to state the covenants on the part of the master; first, that the vessel shall be kept, during the voyage. tight, staunch, and well fitted, tackled with every requisite. and with men and provisions necessary for such a voyage; secondly, that the whole vessel. with the exception of the cabin and the necessary room for the crew. and the sails, cables, and provisions, shall be at the disposal of the charterer; and thirdly, he engages to receive on board all such lawful goods and merchandise as the

charterer or his agents may think proper to ship. The libellant, on his part, agrees to furnish cargoes for the vessel at Portland and Porto Rico, or Turk's Island, and to pay, for the charter of the vessel, 1,175 dollars, one half to be considered as earned at her port of discharge, and so much to be paid as may be required for the vessel's disbursements, and the balance on the delivery of the cargo in the United States, and also to pay all the expenses of loading at Portland. It seems very clear from these covenants that the possession of the vessel was intended to be in the master. He is to victual and man her, he agrees to receive on board such goods as the charterer shall choose to ship. The charterer agrees to furnish the cargoes, to pay the expenses of loading at Portland, and to advance, at her outward port of delivery, so much of the freight as may be required for the vessel's disbursements. Why should these covenants be inserted if the possession of the vessel was to be transferred to the hirer, and to be navigated by him? It is quite evident that this charter-party was a contract of affreightment for the transportation of goods, and not a demise of the vessel; that the owners retained possession under their master, and must be considered, therefore, as carriers.

There is, in the common form of charter-parties, a clause by which the ship and freight are specifically bound for the performance of the covenants in the charter-party. There is none such in this, but this is a condition which, by the marine law, is tacitly annexed to every contract entered into by the master for the transportation of goods, whether by bill of lading or charter-party. The ship is, by operation of law, hypothecated to the shippers for any loss she may sustain from the insufficiency of the vessel or the fault or the master or crew. There is another peculiarity in this instrument. It is usual, in charter-parties of affreightment, as well as in bills of lading, to insert a clause specially exempting the master and owners from losses occasioned by the dangers of the seas. This instrument contains no such exception, but, this, as was justly contended in the argument for the respondents, is an exception, which the law itself silently supplies without its being formally expressed. It is a general rule of law, founded upon the plainest and most obvious principles of natural justice, that no man shall be held responsible for fortuitous events and accidents of major force, such as human sagacity cannot foresee, nor human prudence provide against, unless he expressly agrees to take these risks upon himself. "Casus fortuitous nemo praestat." Pothier, Des Obligations, No. 142. 6 Toullier, Droit Civil, Nos. 227, 228; Dig. 50, 17, 23; Story, Bailm. § 25. There is an exception to this rule, that is entirely consistent with the principle of the rule itself. It is, when the party to be charged has been guilty of some fault, without which the loss would not have happened. The liabilities of the owners, in this case, are precisely the same, and no more extensive than they would have been if the usual exception of the dangers of the seas had been inserted in the charter-party.

Having disposed of these preliminary matters, we come to the questions which have been principally discussed at the bar. They are partly questions of law, and partly fact. In the first place, there does not appear to be any sufficient reason for questioning the seaworthiness of the vessel, when she sailed from Portland. She was carefully examined by Mr. Fickett, a calker, before she was loaded, and he states that, with very slight repairs which were made by him, she was in perfect order for the voyage. And, in point of fact, on her outward passage, and till after she left Turk's Island, she did not leak more than vessels which are considered tight ordinarily do. On the 7th day after sailing on her return voyage, she was found to have sprung a leak. The weather was not at the time, and had not been, tempestuous or unusually bad. There had been, part of the time, a heavy head-beat sea, and the ship at times labored badly. Occasionally there were fresh winds, but not amounting to a gale. On the 7th of November, at 8 o'clock a. m., it was found that the vessel leaked badly. The entry in the log is, that the day commenced with fresh breezes and cloudy weather, with a heavy cross-head-beat sea; at 6 o'clock p. m., took in foretop-gallant-sail, the brig laboring heavily; tried the pump every half hour; middle part of the day, high winds and heavy head-beat sea; tried the pump every quarter of an hour. At 8 o'clock a. m., commenced leaking badly; double-reefed the mainsail, and single-reefed the foretopsail; two hands at the pumps. For the whole 24 hours she kept on her course N. W. with the wind N. N. E. The testimony of the witnesses substantially agrees with the account given in the log. There was a fresh wind with a heavy swell of the sea. The vessel also had a cargo which tried her strength, but all these causes do not seem to have been sufficient materially to injure a strong and staunch vessel. There can, however, be no doubt that she was strained at that time, and her seams were opened so as to admit a considerable quantity of water. During the remainder of the voyage the weather was variable, but the vessel encountered none of unusual severity, until her arrival off Cape Cod. There she met a heavy gale, and was obliged to carry a press of sail to keep off a lee-shore. After it was discovered that the brig leaked, fruitless attempts were made to discover where the leak was, and she continued to leak more or less until her arrival at Portland on the 23d of November. The master then made a protest and called a survey of the vessel.

After the cargo was discharged, the vessel was examined and repaired by the same calker who examined her before the voyage. He stated that he found openings in her seams, which appeared evidently to be recent, and showed that she had been strained during the voyage. There was a leak about a foot in length in the garboard streak. The butts and wood ends were a little slack, and wanted some calking;—there was a small leak under the forecastle, the seams were a little open at the break of the deck, and the water-ways were considerably open. The vessel, on the whole, bore evident marks of having been strained, but the injury could not have been great, as the calker used but thirty pounds of oakum in putting her in good order for another voyage, and the whole expense of repairs did not exceed fourteen dollars. It appears also that the ship was easily kept free of water, during the whole voyage, by one pump, except for a short time when the leak was first discovered.

If the injury to the vessel was so inconsiderable, the question presents itself, how happened it that so large a part of the cargo was lost? All the witnesses, who examined the vessel before the cargo was discharged, agree in ascribing the loss to two causes; first, the limber holes (which are small holes made in the under part of the floor timbers next the keelson, making a passage for the water to flow from the forward part of the vessel back into the well), it appears, were choked up so as to prevent the flow of the water. A considerable quantity of water, which should have found a passage back into the well, was thus constantly kept forward, between the ceiling or skin of the vessel and the outside planks. The second was the want of sufficient dunnage at the bilge, between the first and second thick streaks, in the forward part of the vessel. All the witnesses agree that there was sufficient dunnage on the floor, and also on the sides of the vessel in the after part. But at the bilge, between the two thick streaks, from the mainmast forward, there was on the starboard side about eighty square feet, and on the larboard side about forty square feet uncovered with dunnage. On examining the ceiling here, the seams were found to be open. On the starboard side, one seam was open for five or six feet. to the width of five-eighths of an inch, and on the larboard side there was a seam open as wide, for fifteen or sixteen feet; and generally the ceiling was not sufficiently tight to prevent the water from being forced through by the motion of the vessel. The vessel having a flat floor, when she was sailing with the wind on her beam and thrown down on the opposite side, the water, which was prevented from passing through the limbers into the well, was washed down to her bilge, and by the motion of the ship blown up through the open seams of her ceiling directly upon the salt. Nearly all the witnesses

agree that it was in this way that the salt was lost. And in point of fact the whole extraordinary wastage was [on the sides] [2] in the forward part of the vessel; the loss in the after part was not more than what is usual. The evidence also is, that the salt melted most in the larboard wing, though that was better supplied with dunnage than the other side. But then it appears from the log, that the vessel, during the greater part of the passage, was sailing on her larboard tack, and this would naturally occasion the most waste there, if it was produced by the blowing of the water through the seams of the ceiling. On a view of the whole evidence, it may, I think, safely be taken as an established fact, that the loss of the salt arose from the two causes that have been mentioned.

The whole case, then, seems to be reduced to this, whether the neglect of the owners to provide means for clearing the limber holes, and the neglect of the master to place sufficient dunnage on the wings of the forward part of the vessel to protect the salt from the water, are faults of such a character as to render the parties legally responsible for a loss occasioned by these very deficiencies. If no fault can be imputed to the master or owners on this ground, the loss must be ascribed solely to the dangers of the seas, and be borne by the shipper; for though these dangers were not, by the terms of the charter-party, in terms excepted from the responsibilities of the master, the exception is made by the law. A person is never presumed to take upon himself the risk of inevitable casualties, which the common law somewhat irreverently calls the acts of God, unless he expressly agrees so to do. The law never requires impossibilities. "Impossibilium nulla obligatio est." Dig. 50, 17, 25. But when a party is chargeable with a neglect or fault, without which the loss would not have happened, he will then be held responsible for a loss by inevitable accident, or an accident of major force. It is not that the casualty is imputed to him, but his own neglect or fault which is the occasion of the accident proving fatal. Some vessels have movable boards or plank placed over the limbers, called limber boards, so that they may be taken up to clear the limbers when they become choked; some have a rope or small chain rove through these limber holes to clear them when necessary. This vessel had neither. The board over the limbers was fastened down, and no examination was made to ascertain whether the limbers were free or not. Now, if the importance of providing a passage for the water is such that grooves are cut in the timbers for that express purpose, it certainly would seem to be a want of proper care on the part of the owners to provide no means for keeping them clear; especially as they

---

[2] [From 4 Law Rep. 471.]

are liable to become stopped. If this passage had been kept clear, so as to admit the flow of water from the forward to the after part of the vessel, it is certain that the pump would have easily kept her clear. The accumulation of the water forward would easily have been prevented, and of course the salt would not have been dissolved. And, in the second place, with respect to the dunnage. Upon this point, a number of witnesses of extensive experience in navigation, either as ship-owners or ship-masters, were examined. Some were of opinion that the dunnage in this case was sufficient for a tight vessel; others thought that the dunnage, whether the vessel was tight or not, for a cargo of salt ought to be carried higher up upon the wings. But all agreed that it was insufficient if the vessel was not tight. It must be admitted upon the evidence that the vessel was tight when she received her cargo, and that the leaks were produced by straining with a heavy cargo and a heavy swell of the sea. But, admitting the vessel to be tight, it is still true that some water will find its way into a tight vessel; and it is certain that the ceiling, or what in the language of the sea is called the skin of the vessel, was far from being tight. The seams were open to such a width that in the rolling of the vessel the water, if it did not find its way into the well through the limbers, would be freely blown through them upon the salt.

Did, then, the master or the owner take all the precautions for the safety of the cargo, which were required by the nature of their engagement? The duty of the owners, under a contract of affreightment by a charter-party is to provide a vessel tight and staunch, and every way fit and prepared for the particular service for which she is hired. The seaworthiness of the vessel, and her fitness for the particular voyage, is a term of the contract implied by law. The common law holds the owner to a warranty in this particular, and though the vessel may have been examined before sailing by skillful shipwrights and pronounced by them every way fit for the voyage, yet, if the goods of a shipper are injured from some latent defect of the vessel, the better opinion is that the owner will be responsible. 3 Kent, Comm. 205, 213; Curt. Merch. Seam. 202; Lyon v. Mells, 5 East, 428. And this warranty against latent defects is held by Pothier to result from the nature of the contract. In every contract of letting and hiring, the letter undertakes that the thing let is fit for the purpose for which it is hired. Pothier, Contrat Charte Partie, No. 30; Contract de Louage, Nos. 110, 112. And then with respect to the stowage of the goods, the master is held to the most exact care and diligence, and it is particularly his duty to provide proper dunnage to prevent the goods from being injured by the leakage. Abb. Shipp pt. 4, p. 346, c. 5, § 1. The degree of care will of course depend on the nature of the car-

go, some goods being more liable to injury by exposure to wet than others. My opinion upon the whole is, that the neglect upon the part of the owners to provide means by which the limbers might be kept open so as to leave a free passage for the water from the forward part of the vessel to the well, and the omission on the part of the master to provide proper dunnage for the wings of the forward part of the vessel, are such neglects as render them legally responsible for a loss that may be ascribed directly to those deficiencies.